IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SAMUEL M. JACOBS, | ) | Case No. 5:18-cv-0235 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Samuel M. Jacobs, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act ("Act").  This matter is before me pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).  Because the ALJ did not correctly apply the applicable legal standards, I recommend that the final decision of the Commissioner be VACATED and the matter be REMANDED for further proceedings.

## II.     Procedural History

Jacobs protectively applied for disability insurance benefits and supplemental security income on February 27, 2012.  He alleged a disability onset date of October 15, 2011.  (Tr. 236) His application was denied initially on June 15, 2012 (Tr. 144-150) and after reconsideration on September 14, 2012.  (Tr. 155-159)  Jacobs requested an administrative hearing (Tr. 160), and

Administrative Law Judge ("ALJ") Scott Kidd heard the case on May 30, 2014.  (Tr. 37)  The

ALJ found Jacobs not disabled in a July 16, 2014 decision.  (Tr. 17-36)  Jacobs requested review

of the hearing decision on July 28, 2014.  (Tr. 15)  On December 24, 2014, the Appeals Council

denied review.  (Tr. 1-3)  Jacobs then appealed to federal court.  The court found that the ALJ

did not give good reasons for rejecting the opinions of Jacobs' treating physician, Dr. Walker.

(Tr. 691-718)  The court vacated the ALJ's decision and remanded the claim on February 10,

2016.  (Tr. 718)

    After remand, ALJ Kidd heard the case again on December 5, 2016.  (Tr. 613-659)  He

denied benefits in a January 25, 2017 decision.  (Tr. 584- 604)  The Appeals Council denied

review on December 4, 2017, rendering the ALJ's conclusion the final decision of the

Commissioner.  (Tr. 577-580)  Jacobs filed this action on January 30, 2018.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

    Samuel Jacobs was born on April 6, 1976 and was thirty-five years old when he applied

for social security benefits.  (Tr. 238)  He completed high school and has past work experience

as a cook, fast food worker, granular machine operator, machine operator and restaurant

manager.  (Tr. 602)

### B.    Relevant Medical Evidence[1]

    In March 2010, Jacobs began treating with Mohan Kareti, M.D., for low back pain

radiating down to his left calf.  Jacobs reported that this pain began in July 2009.  Jacobs denied

any neck pain.  Dr. Kareti did not note any arm or hand problems on examination.  Jacobs had

---

[1] The ALJ found that Jacobs has several severe physical and mental impairments.  (Tr. 589)  Because
Jacobs now only raises issues concerning his cervical spine and upper extremity impairments, the
recitation of medical evidence has been limited to those impairments.  ECF Doc. 11 at Page ID# 1131.

full range of motion, full strength throughout the arms and hands and normal sensation and reflexes in the arms.  (Tr. 1039)  Dr. Kareti prescribed pain medication and suggested a low-back injection.  (Tr. 1040)  In the beginning of January 2011, Jacobs reported good pain control with medication and Dr. Kareti refilled his prescription.  (Tr. 1030-1038)

On January 30, 2011, Jacobs went to the emergency room after a car crash at 1:30 in the morning.  He had pain in his left side and had three witnessed seizures earlier in the day.  All examination findings were normal.  (Tr. 370-371)  A CT of his neck showed no evidence of any acute fracture or dislocation.  However, he had degenerative changes at C6-C7, diffuse idiopathic skeletal hyperostosis, and mild congenital narrowing of the central canal.  (Tr. 374)  Jacobs was discharged and advised to take Tylenol or nonsteroidal anti-inflammatories for discomfort.  (Tr. 371)

Jacobs continued to see Dr. Kareti on a monthly basis in January, February and March 2011.  Jacobs continued to report good pain control and his prescription was refilled.  Dr. Kareti continued to note normal findings for Jacobs' neck and arms.  He diagnosed lumbosacral radiculitis.  (Tr. 1027-1029)

Jacobs could no longer afford treatment with Dr. Kareti and established care with Dr. John Walker on April 6, 2011.  Jacobs complained of left hip pain radiating down into his leg. Dr. Walker assessed disc degeneration and sciatica.  He prescribed Percocet and Flexeril.  (Tr. 449)  At his second visit with Dr. Walker, Jacobs reported that he had been off work for three weeks due to pain after moving boxes.  (Tr. 441)  Dr. Walker prepared a letter to Jacobs' employer indicating that he could return to work with certain lifting restrictions.  Jacobs was limited to lifting no more than 15 pounds and needed to sit every 45 minutes to ease the stress on his back and legs.  (Tr. 440)

3

On November 22, 2011, Jacobs reported to Dr. Walker that he had neck and right shoulder pain, numbness and paresthesia in his right arm and hand.  He also reported pain, numbness and paresthesia when he turned his head to the right.  (Tr. 405)  Physical examination showed neck tenderness with abnormal range of motion.  Jacobs had tenderness along the right trapezial area and along the posterior neck; positive Spurling's sign; and he could only rotate his neck to the right to 45 degrees.  His right hand was cold to the touch.  Jacobs' biceps reflex, sensation, and shoulder range of motion were normal and he was able to place his arms overhead at 90 degrees.  Dr. Walker ordered x-rays and prescribed Amitriptyline.  He also referred Jacobs to physical therapy and gave him neck and shoulder exercises.  (Tr. 407)

A cervical spine x-ray taken on December 12, 2011 showed degenerative changes at C5-C6 and C6-C7 and a large osteophyte arising from the anterior - inferior aspect of the C4 vertebral body.  (Tr. 369)  An MRI taken on February 10, 2012 showed large spurs at C3-C4; a disc protrusion at C5-C6; and multilevel degenerative changes with foraminal stenosis at C6-C7.  (Tr. 365)

On January 18, 2012, Jacobs went to the emergency room complaining of a three-week history of pain in the right side of his neck shooting does his right arm.  Physical examination showed tenderness in the right shoulder and neck region but none in the shoulder joint or spine.  He had full strength in both arms, intact sensation in all aspects of arms, excellent grip strength bilaterally, good pulses at both wrists, and no motor asymmetry.  Jacobs was discharged with pain medication and told to follow-up with Dr. Walker.  (Tr. 321)

Jacobs saw Dr. Walker on February 21, 2012.  Jacobs reported more severe problems with his back and shoulders.  He had to quit his job due to pain and was no longer able to use a cane due to right arm pain.  Dr. Walker found decreased sensation in one arm and normal

strength and ranges of motion in both shoulders.  Dr. Walker referred Jacobs to an orthopedic clinic for the cervical disc herniation.  (Tr. 395-398)  On March 21, 2012, Dr. Walker's examination showed neck tenderness and abnormal range of motion.  (Tr. 475)

In July 2012, Jacobs told Dr. Walker that he was feeling "pretty good" and had less pain. He said he didn't need to use his cane as much and denied any falls.  Dr. Walker noted neck tenderness and abnormal neck range of motion, but normal strength in the arms.  (Tr. 470-471)

On September 16, 2012, Jacobs went to the emergency room reporting neck and low back pain.  He said that he had fallen down some steps the night before.  Jacobs complained of low back pain and right shoulder and thumb pain.  He did not have any neck pain or radicular symptoms.  (Tr. 386)  He had full muscle strength in his upper and lower extremities.  He had full range of motion in his right thumb.  A CT scan of the head and C-spine were negative except for mild degenerative disc disease at C4-C5, C5-C6, and C6-C7.  (Tr. 387-388)

Jacobs followed-up with Dr. Walker on September 25, 2012.  He continued to have pain in the left side of his face, his chest, his neck and shoulder blades.  Dr. Walker noted neck and back stiffness and pain and limitation of joint movements.  (Tr. 467-468)

On October 15, 2012, Dr. Walker noted neck stiffness and pain but normal neck range of motion.  Jacobs went to the emergency room on October 28, 2012.  (Tr. 382)  He complained of back and knee soreness but denied any neck pain or peripheral numbness or tingling.  Jacobs had full strength in his upper and lower extremities and no midline tenderness over the cervical or thoracic spine.  (Tr. 382-383)

On January 9, 2013, Jacobs followed-up with Dr. Walker.  His pain was better controlled with his medications, but he still needed some assistance with his daily activities.  Dr. Walker

noted neck tenderness, but normal range of motion.  He recommended regular physical activity and flexibility exercises.  (Tr. 494)

Jacobs followed up with Dr. Walker on May 1, 2013.  (Tr. 489)  Jacobs reported improvement with functioning.  Dr. Walker noted neck tenderness but normal neck range of motion.  He continued to recommend regular physical activity including aerobic activity and flexibility exercises.  (Tr. 489-491)

Jacobs was hospitalized for infectious endocarditis in September 2013 and had several follow-up appointments with different physicians after this infection.  (514-522)  His next appointment for his neck and upper extremity impairments was with Dr. Walker on February 20, 2014.  Jacobs complained of weakness in his legs and numbness and tingling in his fingers.  Dr. Walker noted neck tenderness but normal range of motion in his neck and shoulders, normal sensation and motor strength.  (Tr. 567-569)  Dr. Walker made the same observations at an appointment in April 2014.  (Tr. 574-575)

Kimberly Sheets, D.O., started treating Jacobs in June 2014 because Dr. Walker left the practice.  Jacobs reported pain in his upper back between his shoulder blades and weakness in his right hand.  (Tr. 886)  Physical examination showed abnormal right wrist range of motion, muscle weakness and decreased muscle tone in his right upper extremity.  Dr. Sheets also observed a tremor.  (Tr. 888)  She referred Jacobs to a neurologist and later referred him back to Dr. Kareti.  (Tr. 889-890)

A pain management specialist, Dr. Kareti, evaluated Jacobs in September 2014.  Dr. Kareti noted tenderness in the cervical paraspinal muscles.  Jacobs had full range of motion in his neck and shoulders, normal sensation and motor strength.  (Tr. 1023)  He diagnosed cervical spondylosis and recommended treatment for Jacobs' lower back pain.  (Tr. 1026)

On April 30, 2015, Jacobs received a lumbar epidural steroid injection at L4-L5. (Tr. 957-958) Otherwise, no other relevant treatment is noted in the records for 2015.

Jacobs went to the pain clinic in March 2016 and saw Jamesetta Lewis, D.O. Jacobs reported neck pain radiating to his shoulders and numbness in both arms. (Tr. 1016) Dr. Lewis noted positive Spurling's signs bilaterally and tenderness to palpation of the cervical spine, but also noted full strength and intact sensation in the arms and no focal neurologic defects. (Tr. 1019)

At follow-up appointments at the pain clinic in June and August 2016, Jacobs continued to report neck pain radiating to his shoulders and numbness in his hand. He reported adequate pain relief with his analgesic therapy. He denied any side effects. At each examination his sensation and reflexes were intact and he had normal strength and equal hand grasp. However, the doctor also noted positive Spurling's sign, neck muscle tenderness, muscle spasms, and restricted neck range of motion. (Tr. 1006-1008, 1011-1013)

Jacobs attended a physical therapy assessment evaluation for his back pain in July. He reported that he had pain in the neck and shoulders and intermittent numbness in his hands. (Tr. 987) During the evaluation, Jacobs' grip strength was measured as 82 pounds per square inch ("psi") in the left hand and 86 psi in the right. (Tr. 989)

Jacobs attended a follow-up appointment with Dr. Lewis on November 23, 2016. Jacobs stated that the current treatment improved his symptoms and ability to perform activities of daily living. Jacobs' recent urine drug screen was inconsistent with his current medications but he was permitted to submit a repeat sample at the appointment. (Tr. 1041)

Jacobs went to the emergency room for chest pain and shortness of breath on November 25, 2016.  (Tr.1055)  Physical examination notes state that Jacobs' musculoskeletal and neurological systems were normal.  (Tr. 1066)

Jacobs followed up with his primary care clinic on December 14, 2016.  Jacobs' neck was supple and he had normal range of motion; his muscle tone was normal; and there were no abnormal arm findings.  (Tr. 1070-1071)

### C.    Opinion Evidence

#### 1.    Treating Physician – Dr. John Walker

On May 14, 2012, Dr. Walker completed a questionnaire opining that Jacobs could carry up to ten pounds occasionally.  He opined that Jacobs was markedly limited in handling and extremely limited in reaching.  However, the questionnaire did not differentiate between overhead reaching and reaching in other directions, and it did not ask any questions regarding fingering.  (Tr. 361)

On August 17, 2012[2], Dr. Walker electronically signed a letter stating that Jacobs was not able to return to work for an indefinite amount of time due to herniated discs and sciatica.

On October 16, 2012, Dr. Walker completed a residual functional capacity questionnaire. (Tr. 377-378)  He opined that Jacobs could occasionally lift ten pounds and could use his fingers for fine manipulation 90% of an eight hour work day; use his hands to grasp, turn and twist objects 60% of the day; and reach 25% of the day.  Dr. Walker also opined that Jacobs was not able to work full time and would likely miss work more than four times a month.  (Tr. 378)

On January 16, 2013, Dr. Walker completed another residual functional capacity questionnaire.  (Tr. 483-484)  Dr. Walker opined that Jacobs could occasionally lift ten pounds,

---

[2] This letter is dated March 16, 2012, but Dr. Walker did not sign it until August 17, 2012.

but he indicated that Jacobs did not have any limitations for repetitive reaching, handling, or fingering.  (Tr. 484)

Dr. Walker completed another residual functional capacity questionnaire in August 2013. On this form, Dr. Walker indicated that Jacobs could reach, handle and feel 40% of the workday. He restated his opinions that Jacobs would likely miss more than four days of work a month and was not able to work full-time.  (Tr. 505)  He opined that these limitations existed since he began treating Jacobs in April 2011.  (Tr. 506)

### 2. Consulting Examiner – Paul Scheatzle, D.O., - September 2016

Paul Scheatzle, D.O., performed a consultative examination in September 2016.  He found decreased neck range of motion.  Jacobs had flattening of the cervical and lumbar lordosis and the thoracic kyphosis; diffuse pain on palpation of the cervical paraspinal muscles and trigger points between his shoulder blades.  Jacobs' cervical spine range of motion was decreased and he had pain with range of motion in his right shoulder.  He had grip strength of 30 pounds on the right and 8 pounds on the left.  He had numbness in the left thumb and forefinger. Dr. Scheatzle noted negative Tinel's and Phalen's signs.  Dr. Scheatzle diagnosed chronic pain syndrome with evidence of lumbar degenerative disc disease, cervical and thoracic myofascial pain, evidence of left carpal tunnel syndrome and history of anxiety.  (Tr. 1000)  He opined that the muscle testing he performed was not reliable due to "give way weakness."  (Tr. 1001)  Dr. Scheatzle opined that Jacobs could lift and carry 30 pounds occasionally and 20 pounds frequently.  He reported that Jacobs could handle only occasionally.  He did not specifically opine as to his ability to finger or reach.  However, he stated that Jacobs had decreased grasp strength but otherwise normal manipulation, pinch and fine coordination in the hands.  (Tr. 1000)

### 3. State Agency Reviewing Physicians

On June 12, 2012, William Bolz, M.D., reviewed Jacobs' medical records and opined that Jacobs could lift and carry ten pounds, was limited to frequent bilaterally reaching in all directions, and was limited to frequent handle/gross manipulation in both hands.  (Tr. 103-104)

On September 12, 2012, Elizabeth Das, M.D., reviewed Jacobs' medical records and agreed with the opinions of Dr. Bolz.  (Tr. 125-127)

### D. Testimonial Evidence

#### 1. May 2014 Hearing

At the May 2014 hearing, Jacobs testified that he had neck and shoulder blade pain that went down his arms to his hands and made his hands feel numb on a daily basis.  (Tr. 56) Vocational Expert Lynn Smith opined that no jobs would be available to a person with Jacobs' age, education and work experience with the residual functional capacity to perform sedentary work with only occasional reaching, handling and fingering.  (Tr. 67-69)

#### 2. December 2016 Hearing

At the second administrative hearing, Jacobs testified that he continued to have daily pain in his neck that radiated down his arms and into his hands.  He had difficulty reaching overhead and in other directions.  (Tr. 634)  He experienced tingling, pins and needles, and numbness in his arms and hands throughout the day.  (Tr. 628-629)  His left, dominant hand was worse than his right.  (Tr. 620, 630)  Jacobs had difficulty holding things and would drop them because of the numbness in his arms and hands.  He had difficulty shaving and reaching his hands up to wash his hair.  (Tr. 632-633)  He also had difficulty with buttons, tying his shoes, and fastening his belt.  (Tr. 642)

Vocational Expert Bernard Preston testified that a person with the same work experience as Jacobs and the residual functional capacity determined by the ALJ, including a limitation for occasional overhead reaching bilaterally, frequent reaching in all other directions, and frequent fine and gross bilateral manipulation, could perform occupations including order clerk, inspector, and surveillance systems monitor.  (Tr. 603, 646-647)  If the individual was limited to occasional fine and gross manipulation bilaterally, the VE opined that such a person could still perform the surveillance system monitor occupation, as well as the occupation of caller operator and election clerk.  (Tr. 647-648)

## IV.    The ALJ's Decision

The ALJ's January 25, 2017 decision contained the following relevant findings:

3.  The claimant has the following severe impairments:  cervical spondylosis, myofascial pain syndrome, opiate dependency, chronic pain syndrome, cervical radiculopathy, cervical degenerative disc disease, lumbar spondylosis, lumbar radiculopathy, lumbar degenerative disc disease, chronic obstructive pulmonary disease, sciatica, depression and anxiety.  (Tr. 589)

5.  After careful consideration of the entire record, I find that the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can alternate between sitting and standing approximately every thirty minutes.  He can occasionally balance, stoop, kneel, crouch and crawl.  He can occasionally reach overhead bilaterally, and frequently reach in all other directions.  He is limited to frequent fine and gross manipulation with the bilateral upper extremities.  He should avoid concentrated exposure to temperature extremes and respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation.  He should have no exposure to unprotected heights or operating dangerous moving machinery.  He is limited to unskilled work consisting of simple, routine, repetitive tasks in a static environment with no strict time or strict high production quotas.  (Tr. 592)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 602)

Based on all of his findings, ALJ Kidd determined that Jacobs had not been under a disability from October 15, 2011 through the date of the decision.  (Tr. 603-604)

V.     **Law & Analysis**

    A.     **Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535,545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec*., 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must use the following sequential analysis: at Step One, the Commissioner asks whether the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines whether one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the

Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the Commissioner to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. See *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

### B. Treating Physician Rule[3]

Jacobs argues that the ALJ did not properly evaluate and weigh the opinions of Dr. Walker, his treating physician, and the consulting examiner, Dr. Scheatzle. Both of these physicians opined that Jacobs was limited to *occasional* (or less) handling, manipulating, or fingering objects. (Tr. 505, 1000) Jacobs' arguments are narrowly tailored to the ALJ's less restrictive finding that Jacobs had the residual functional capacity to *frequently* reach in all directions, other than overhead, and *frequently* use fine and gross manipulation of his upper extremities. (Tr. 592)

The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the

---

[3] 20 CFR §§ 416.927 applies to Jacobs' claim because it was filed before March 27, 2017.

other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938. ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r*

*of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

from ALJs that do not comprehensively set forth reasons for the weight assigned."  *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

(internal quotation marks omitted).

### 1.    Treating Physician - Dr. John Walker

The ALJ considered the various opinions expressed by Dr. Walker.  In relevant part, the

ALJ stated:

> On May 14, 2012, Dr. Walker opined that … the claimant was markedly limited
> in handling, and extremely limited in pushing/pulling, bending, reaching, and
> repetitive foot movements.  He stated that the claimant was unemployable (4F).
> The opinion of Dr. Walker on May 14, 2012 is not entitled to controlling weight.
> However, it is given some weight.  The record supports a limitation to the
> sedentary exertional level based on some positive straight leg raising tests,
> complaints of pain, and atrophy of the left leg.  However, the form, which he
> completed, uses definitions such as "extremely limited" or "markedly" without
> clearly defining these terms.  Further, while he noted marked limitation in the use
> of the upper extremities, the record lacks consistent evidence to support such a
> limitation.  Indeed, the record shows multiple instances of normal and
> symmetrical grip strength (e.g. 2F/2-3 and 22F/95-99) and instances of decreased
> and unsymmetrical grip strength.  (23F)  No explanation for the conflicting results
> has been given.  While the claimant was diagnosed with left carpal tunnel
> syndrome (23F), the record lacks EMG findings to corroborate such a diagnosis.
> Moreover, his complaints are inconsistent with the activities in the record such as
> working in the garden.  (1F/3-4)
>
> * * *
>
> On October 16, 2012, Dr. Walker opined … that the claimant [could] use his
> hands for grasping, turning and twisting objects for 60% of the workday.  He said
> he could use his fingers for fine manipulation 90% of the workday.  * * *  The
> opinion of Dr. Walker on October 16, 2012, is not entitled to controlling weight.
> Despite being an acceptable medical source and a treating source, the opinion of
> Dr. Walker is internally inconsistent, with the record, and inconsistent with his
> other opinions given in 2012 and 2013.  He stated that the claimant's impairments
> would seldom interfere with concentration, yet noted that the claimant need [*sic*]

16

to shift at will and walk only one-half block.  This suggest [sic] a degree of pain, which would more than limit one's concentration.  Further, the record contains multiple instances of normal findings in the claimant's hands.  (8F/4, 13, and 9F/8).  I note that the claimant gave conflicting information to Dr. Walker during treatment as shown in the record.  For instance, the claimant expressly denied using drugs when questioned by Dr. Walker (8F/8) yet he had just tested positive for marijuana prior to the visit (5F/2).  At other times in the record, the claimant gave inconsistent information.  He stated during emergency department treatment that his legs gave out while going down stairs (9F/8) but earlier admitted he had been drinking (7F/7).  The record also indicates that the claimant gave incorrect information about having a prescription for 90 narcotic pills just ten days before requesting more medication in the emergency department (2F/2-3).  While these statements are not used to impeach the claimant's veracity, they are relevant because it is evidence that the claimant gave incorrect information, which was relied upon by his treating physicians in determining the course and nature of his symptoms.  Finally, the record shows variations in the opinions of Dr. Walker (e.g. 10F with no fine or gross manipulations), with no explanation or corroborating findings in the record to suggest a change.

* * *

On January 16, 2013, Dr. Walker opined that … the claimant had no limitations in doing repetitive reaching, handling, or fingering.  * * *  Consistent with Dr. Walker's other opinions, the January 16, 2013, is not entitled to controlling weight.  Indeed despite only a seven-month period between his previous opinion, he offered significant changes in the claimant's functioning without an explanation or corroboration in the record.  Indeed, during the period in which he offered the opinion, the claimant appeared during treatment with normal unassisted gait.  (7F/3-5 and 11F/5, 8).  Moreover, despite earlier opining to limitations in fine and gross manipulation, he did not indicate any limitations.  Therefore, the opinion of Dr. Walker on January 6, 2013, is given little weight.  Furthermore, as noted above, there remain questions as to the accuracy of the information provided to Dr. Walker.

Dr. Walker opined on August 23, 2013, that the claimant could … use his hands, fingers and arms for grasping, turning, fine manipulation, and reaching 40 percent of the time.  * * * The August 23, 2013, opinion of Dr. Walker is given little weight and is not affording [sic] controlling weight despite him being an acceptable source and a treating source.  As noted in the analysis of the January 2013 opinion, despite no significant changes in the medical record, Dr. Walker's opinion changed from no limitations in fine and gross manipulation, to a 40% limitation in all use of the hands, fingers and arms.  Given the lack of explanation and the absence of significant findings to corroborate such changes, his opinion is of limited probative value.  Moreover, setting aside the opinion-to-opinion inconsistencies, the record does not support the degree of limitation in the

> claimant's extremities as alleged.  Indeed, the record contains multiple instances
> of normal findings in the claimant's hands.  (8F/4, 13 and 9F/8).

(Tr. 598-601)

The ALJ was permitted to assign less than controlling weight to Dr. Walker's opinions if they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and inconsistent with the other substantial evidence in the case record.  Here, the ALJ's main reasons for rejecting Dr. Walker's opinions were that they were inconsistent with one another and that they may have been based on inaccurate reporting by Jacobs.

Regarding the inconsistency of Dr. Walker's opinions, I agree that Dr. Walker's seemingly inconsistent opinions over the period in which he treated Jacobs made it difficult to determine which of his opinions should carry the most weight.  And, Dr. Walker's failure to complete the January 2013 questionnaire's upper extremity section made the ALJ's job more difficult.  This form provided no insight into the physician's opinions about Jacobs' ability to use his upper extremities during the workday.  Even so, Dr. Walker was a treating physician and, if his opinions were not assigned controlling weight, the ALJ was required to provide good reasons for the weight he did assign.

In the February 10, 2016 memorandum opinion, this court already explained that the ALJ's rejection of all of Dr. Walker's opinions because they seemingly contradicted one another was not in line with the agency's good reasons rule.  The court indicated that the ALJ should have explained why he rejected Dr. Walker's more restrictive limitations with respect to reaching and gross manipulation.  (Tr. 717)  The ALJ arguably attempted to do this.  He cited records which he said showed normal findings regarding the claimant's hands.  (Tr. 601)  However, these records, like other records cited by the ALJ, do not necessarily conflict with Dr. Walker's more limited opinions related to handling.  For example, he ALJ cited an office note from

18

February 21, 2012 to show "normal findings."  But this particular office note also stated that Jacobs was complaining of neck pain, paresthesias and weakness in his right upper extremity and that an MRI showed a disc protrusion at C5-C6.  (Tr. 395)  These do not appear to be "normal" findings.  Thus, it appears that the ALJ did not actually provide a better explanation of his rejection of Dr. Walker's opinions related to Jacobs' upper extremity limitations.

The ALJ also stated that Dr. Walker's opinions were based on Jacobs' false reports.  He cited instances of Jacob's reports to Dr. Walker, such as a claim that he had no "substance use" despite testing positive for marijuana the same day.  (Tr. 364, 401)  The ALJ inferred that Dr. Walker must have relied on Jacobs' false reporting in forming his opinions.  (Tr. 599)  But this was not a proper basis to assign less than controlling weight to Dr. Walker's opinions.  Jacobs' use of marijuana was irrelevant to Dr. Walker's opinions regarding Jacobs' upper extremity limitations.  And, there were objective findings in the record supporting Dr. Walker's opinions regarding Jacobs' upper extremity limitations.  For example, in the May 2012 report, Dr. Walker noted that an MRI showed disc herniation and multilevel degeneration of Jacobs' cervical spine.  (Tr. 361)  Moreover, by assuming that Dr. Walker relied on false reporting by Jacobs, the ALJ seemingly felt that he was in a better position to evaluate Jacobs' reports than his treating physician.  Yet, one of the reasons the treating physician rule existed is because the agency considered the treating physician to be in a better position to determine the abilities of his or her patient due to the longitudinal relationship between physician and patient.[4]

---

[4] "Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(c)(2).

In assigning less than controlling weight to Dr. Walker's opinions, the ALJ did cite some of the medical records which he found to be inconsistent with the opinions.  The ALJ was required to point to "evidence in the case record, * * * sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  And, as already stated, the ALJ may have attempted to do so.  (Tr. 599)  Unfortunately, these records show that, once again, the ALJ failed to properly support the decision to assign little weight to Dr. Walker's opinions.

 For example, concerning Dr. Walker's May 14, 2012 opinion, the ALJ stated that it was inconsistent with portions of the record showing normal and symmetrical grip strength "(e.g. 2F/2-3 and 22F/95-99)."  The first of these records documented Jacobs' complaints of pain radiating down his right arm and numbness and tingling to an emergency room doctor.  The record showed that Jacobs had normal grip strength, but that does not necessarily contradict Dr. Walker's opinions.  In other words, it is possible that Jacobs would not be able to maintain function of his upper extremities for a full workday due to the pain, numbness and tingling in his upper extremity even with a test showing normal grip strength.  The second record the ALJ cited was from a physical therapy evaluation.  These four pages of medical notes show Jacobs' grip strength as 82 psi on the left and 86 psi on the right.  But they also contain information supporting Dr. Walker's opinions, such as Jacobs' report that he had intermittent numbness in his hands; that he dropped cups; and that he could not use his cane, at times, due to the numbness. (Tr. 988)  These records do not necessarily contradict Dr. Walker's opinions.  Moreover, the ALJ acknowledged that there were also instances of decreased and unsymmetrical grip strength in the

record.  (23F)  These types of varying results actually supported Jacobs' subjective reports of intermittent numbness.  But, these records do not support the ALJ's decision to assign little weight to Dr. Walker's opinions.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly when a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied."  *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  In this case, the ALJ failed to provide a proper basis for assigning less than controlling weight to Dr. Walker's opinions.  And here it must be particularly confusing to Mr. Jacobs because the district court already remanded this case once for the same reason.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion can be harmless error.  These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation."  *Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the

claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. App'x at 551.

Here, the ALJ did not provide good reasons for assigning less than controlling weight to Dr. Walker's opinion.  Portions of the records cited by the ALJ actually supported Dr. Walker's opinions.  The court cannot determine whether the ALJ even considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6), including whether the medical evidence in the record as a whole supported Dr. Walker's opinions.  The ALJ's failure to provide "good reasons" for rejecting Dr. Walker's opinion regarding Jacobs' limitations was not harmless error.  Even if good reasons existed to reject the treating physician's opinion[5], the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review.  The Court should reject the ALJ's determination.

## 2.  Consulting Examiner Dr. Scheatzle

The ALJ also erred in evaluating the opinions of the consulting examiner, Dr. Scheatzle. Dr. Scheatzle met with Jacobs on September 12, 2016, after the court remanded the case and before the ALJ's second administrative hearing.  Dr. Scheatzle opined that Jacobs could handle objects occasionally.  He observed:

---

[5] The Commissioner cites evidence from the record in support of the ALJ's residual functional capacity determination.  Although the Commissioner's *post hoc* arguments may support the ALJ's decision, this court is required to determine whether the *ALJ* stated good reasons in his decision for assigning less than controlling weight to the treating physician.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994).

On grip dynamometer strength testing he has less than expected strength at 30 lbs maximum right and 8 lbs. maximum left.  Does have some slight associated numbness in the left thumb and index finger but negative Tinel's and Phalen's.

* * *

 Decreased grasp strength but otherwise normal manipulation, pinch and fine coordination.

(Tr. 1000)

20 C.F.R. § 416.927(c)(2) provides that the agency "generally, … give[s] more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you."  In evaluating Dr. Scheatzle's opinion, the ALJ stated:

> State Agency consultative examiner, Paul Scheatzle, D.O., examined the claimant on September 12, 2016, and opined that he had unlimited ability to sit.  He said the claimant could stand frequently up to two-thirds of the day.  He said the claimant would need to change position every 30 minutes.  He stated that he could walk one city block with a straight cane.  He said he could lift up to 30 pounds occasionally and twenty pounds more frequently.  He said the claimant could handle objects occasionally, but should not perform repetitive bending or twisting, and no climbing and crawling.  He said he should not operative [sic] heavy equipment on pain medications (23F/2).  The opinion of Dr. Scheatzle is given some weight because he is an acceptable medical source who examined the claimant.  However, his opinion regarding the need to change position is not supported by his examination findings or his opinion that the claimant can lift 30 pounds.  He noted some left thumb and index finger numbness and decreased grip strength but did not indicate limitations in this area.  Finally, his opinion was informed by the claimant's report of failed physical therapy, injections and a TENS unit despite one visit of physical therapy without evidence of returning, one injection, and a lack of ongoing TENS unit treatment.  Therefore, the opinion of Dr. Scheatzle is only given some weight.

(Tr. 601)  The ALJ recognized that Dr. Scheatzle noted numbness in Jacobs' fingers and decreased grip strength but stated that Dr. Scheatzle "did not indicate limitations in this area." However, Dr. Scheatzle clearly opined that Jacobs was limited to occasionally handling objects. (Tr. 1000)  The ALJ did not limit his RFC determination to occasional handling and he did not explain why he determined that Jacobs was capable of frequent handling even though the examining medical sources opined that he had greater limitations in this area.

23

The ALJ purportedly assigned only "some" weight to the state agency reviewing physicians, Dr. Bolz and Dr. Das.  However, he adopted their opinions as to frequent reaching and handling bilaterally.  (Tr. 600)  Thus, in regard to this area of functioning, it appears that he assigned controlling weight to the non-examining physicians' opinions.  He did this despite opinions in the record from Jacobs' treating physician and the consultative examiner that Jacobs' functional abilities in this area were more limited.  The ALJ provided an inadequate explanation for his treatment of these medical source opinions.  And, in assigning less weight to the examining physicians' opinions, the ALJ was required to cite substantial evidence beyond the medical opinions of the nontreating and nonexamining doctors.  Because he failed to do so, the Court should reject his determination.

## VI.   Recommendation

Because the ALJ failed to apply the correct legal standards, I recommend that the final decision of the Commissioner be VACATED and that this case be remanded for further proceedings consistent with this report and recommendation.

Dated: October 16, 2018

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).